**Johanna TREVINO, Plaintiff,**

v.

**Daryl GATES, et al., Defendants.**

**CV 92–1981 JSL.**

United States District Court,
C.D. California.

June 15, 1995.

Stephen Yagman, Yagman & Yagman, P.C., Venice, CA, for plaintiff.

Annette Keller, Asst. City Atty., Louis R. Miller, Christiansen, White, Miller, Fink & Jacobs, Los Angeles, CA, for defendants.

### ORDER AND OPINION GRANTING PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

LETTS, District Judge.

Before the Court is plaintiff Johanna Trevino's motion for attorney's fees pursuant to 42 U.S.C. § 1988, which came for hearing regularly on March 20, 1995. This case, juxtaposed with two previous cases in which the Court awarded attorney's fees to the same counsel, *Gomez v. Gates,* 804 F.Supp. 69 (C.D.Cal.1992), and *Gillen v. Gates,* 847 F.Supp. 1475 (C.D.Cal.1994), *aff'd,* 56 F.3d 71 (9th Cir. June 1, 1995) (Table), illustrates once again the difficulty of arriving at a "reasonable" attorney's fee in § 1988 cases using the conventional lodestar analysis or other mandatory formulae.

### I. BACKGROUND

A brief history of this case is necessary to provide background for the discussion of attorney's fees.

Plaintiff Johanna Trevino is the daughter of one of three men killed by officers of the Special Investigation Section of the Los Angeles Police Department ("LAPD"). The men were killed in 1990, while in the course of committing a robbery. The survivors of the three men killed filed suit against the officers, Chief Daryl Gates and the City of Los Angeles in *Gomez v. Gates*, CV 90–0856 (JSL). After a 13–week trial, a jury found the officers and Gates were liable for the unconstitutional use of excessive force. The jury awarded nominal compensatory damages and punitive damages in the amount of $44,000.[1] After judgment was entered, the Los Angeles City Council voted to have the City pay the punitive damages award pursuant to Cal.Gov.Code § 825(b).[2]

In May 1992, plaintiff, born after the filing of the *Gomez* case, filed this lawsuit against the original *Gomez* defendants and added the members of the Los Angeles City Council in their individual and official capacities. Plaintiff alleged that the City and the Council members deprived her of her civil rights by participating in a policy of indemnifying Los Angeles police officers against liability for the unconstitutional use of excessive force without regard to the statutory considerations of § 825(b). Plaintiff alleged that this policy encouraged the use of such force and amounted to deliberate indifference to her constitutional rights.

In August 1992, the Council members moved to dismiss plaintiff's complaint against them on the grounds of absolute immunity. The Court denied the motion, ruling that the Council members' votes to indemnify police officers are discretionary actions and therefore are not legislative acts entitling them to absolute immunity. *Trevino v. Gates*, 798

F.Supp. 621, 623–24 (C.D.Cal.1992), *aff'd*, 23 F.3d 1480 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 327, 130 L.Ed.2d 286 (1994). The Court bifurcated the trial to allow plaintiff's suit against the officers and Gates to continue while the issue of absolute immunity was appealed. The Ninth Circuit affirmed in May 1994, and the Supreme Court denied *certiorari* in October 1994.

In March 1993, the Court held that the parties were collaterally estopped from relitigating two issues already determined in the *Gomez* case: (1) the liability of the individual defendant officers for the use of excessive force and (2) the facts underlying the finding of punitive damages in the *Gomez* case. Order Granting Defendants' Motion for Summary Judgment as to Certain Issues, March 4, 1993 at 4. The Court advised counsel of its preliminary view that any second jury award of punitive damages substantially in excess of that awarded to the plaintiffs in *Gomez* would probably be considered to be excessive if awarded on identical evidence and might be subject to reduction based on the principle of *remittitur*. To avoid another lengthy trial of the original facts, the defendant officers stipulated to a punitive damage award of $9109, the highest aggregate damages that were awarded to any one plaintiff in the *Gomez* case. *See id.* As a result of these rulings and the stipulation, the only issues left to be litigated against the police officers in this case was whether plaintiff was the natural daughter of the man killed and the amount of compensatory damages, if any, to which plaintiff was entitled.

In December 1993, the case against the officers for compensatory damages came to trial. The Court declared a mistrial when plaintiff's counsel referred to the defendants

---

**1.** In *Gomez*, the Court awarded plaintiffs' attorney a fee of $378,175. *Gomez v. Gates*, 804 F.Supp. 69 (C.D.Cal.1992).

**2.** Cal.Gov.Code § 825(b) authorizes the City Council to indemnify an employee for a judgment for punitive damages, if it finds all of the following: (1) the judgment is based on an act or omission of an employee or former employee acting within the course and scope of his or her employment as an employee of the public entity; (2) at the time of the act giving rise to the liability, the employee or former employee acted, or failed to act, in good faith, without actual

malice and in the apparent best interests of the public entity; and (3) payment of the claim or judgment would be in the best interests of the public entity. Cal.Gov.Code § 825(b).

A vote to indemnify a police officer under § 825(b) effectively overrules a jury's finding of the officer's bad faith. *See Cornwell v. City of Riverside*, 896 F.2d 398, 399 (9th Cir.), *cert. denied*, 497 U.S. 1026, 110 S.Ct. 3274, 111 L.Ed.2d 784 (1990) (noting that a city is not bound by jury's finding when it makes its decision to indemnify).

as "murderers" in his closing argument. The case was mistried once again in October 1994, to avoid a failure of proof, after the Court ruled that the testimony of plaintiff's first two witnesses was inadmissible and plaintiff was unable to have her remaining witness present.

The trial was reset for December 6, 1994. At this time, bifurcation of issues or parties was no longer necessary because the Supreme Court had denied *certiorari* on the issue of absolute immunity. One day before trial, the City Council members moved for summary judgment on the basis of qualified immunity. The City moved for summary judgment on the merits. The Court continued the trial to February 6, 1995. After briefing and argument, the Court granted the motions both of the City Council members and of the City.

After a three-day trial to determine the amount of compensatory damages suffered by plaintiff, the jury returned a verdict against the officer defendants awarding nominal damages of $1.00.[3] The Court subsequently entered judgment in that amount and in the amount of $9109 in punitive damages, in accordance with the defendants' stipulation.

Plaintiff now moves for attorney's fees and costs as a prevailing party under 42 U.S.C. § 1988. Plaintiff has requested a total of $495,885 in attorney's fees.[4]

## II. ANALYSIS

### A. *Attorney's Fees under Section 1988*

The Civil Rights Attorney's Fees Award Act of 1976 confers discretion upon district courts to award fees to a prevailing party in a civil rights action. 42 U.S.C. § 1988.

The purpose of § 1988 was to encourage private enforcement of the civil rights acts and to provide private citizens with "a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S.Rep. No. 94–1011 at 2, 1976 U.S.C.C.A.N. at 5908, 5910. Congress recognized that the remedy of attorney's fees was an "integral part of the remedy necessary to achieve compliance with [the] statutory policies," *id.*, and stated that a prevailing party "should· ordinarily recover an attorney's fee unless special circumstances would render such an award unjust," *id.* at 4, 1976 U.S.C.C.A.N. at 5912.

In the past two decades, the Supreme Court and the circuit courts have enunciated a multitude of standards for trial courts to follow in determining a "reasonable" fee for prevailing parties under various fee-shifting statutes. These decisions culminated in a series of decisions between 1983 and the end of 1992, which appeared to standardize the determination of fees under all such fee-shifting statutes into a single bright line calculation called the "lodestar." The lodestar figure is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

Before 1983, reasonable fees were calculated in a variety of ways. The most favored appears to have been the discretionary consideration of the so-called twelve "*Johnson* factors,*"* enunciated as guidelines in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974).[5] *See Kerr v. Screen Extras*

---

3. The jury operated within very narrow parameters to make this determination. The jury was informed only that plaintiff's father had been shot wrongfully by the police officer defendants while he had been committing a robbery.

4. Plaintiff requests $467,760 for lead counsel's work (587.2 hours multiplied by a $400 hourly rate and a 2.0 multiplier) and $28,125 for assistant counsel's work (112.5 hours multiplied by a $250 hourly rate).

   Plaintiff also requested $32,192.84 in costs and filed an application to tax costs with the clerk of the court requesting $10,152.90 in costs. The clerk taxed costs in the amount of $1,930. Both plaintiff and defendants have moved to retax costs. The Court addresses the award of expenses and costs in a separate order.

5. The twelve factors include the following: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10)

*Guild,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) (adopting these guidelines as "appropriate factors to be considered in the balancing process required in a determination of reasonable attorney's fees"); *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir. 1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). The *Johnson* factors were cited with approval in the legislative history of § 1988. *See* S.Rep. 94–1011 at 6, 1976 U.S.C.C.A.N. at 5913.[6]

In *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), the Supreme Court attempted to clarify the standard for determining a reasonable fee. The Supreme Court stated that "[t]he most useful starting point" was the lodestar, but that "[t]here remain[ed] other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of 'the results obtained.'" *Id.* at 432, 103 S.Ct. at 1939–40. For cases that resulted in partial or limited success, the Supreme Court granted trial courts discretion to eliminate specific hours that related to claims upon which a plaintiff did not succeed or to "simply reduce the award to account for the limited success." *Id.* at 436, 103 S.Ct. at 1941.

After *Hensley,* the Supreme Court took increasingly strong positions that some or all of the *Johnson* factors were subsumed within the lodestar calculations and thereby were not to be considered separately. In *Blum v. Stenson,* 465 U.S. 886, 897–901, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984), the Supreme Court held that the lodestar normally provides a reasonable fee, and that an enhanced award may be justified only in cases of "exceptional success." In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 562–66, 106 S.Ct. 3088, 3096–98, 92 L.Ed.2d 439 (1986) (*Dela-*

*ware Valley I* ), the Supreme Court concluded, "In short, the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee, and it is unnecessary to enhance the fee for superior performance. . . ." The Court held in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 727, 107 S.Ct. 3078, 3088, 97 L.Ed.2d 585 (1987) (plurality opinion) (*Delaware Valley II* ), that "multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible under the usual fee-shifting statutes."

In *City of Burlington v. Dague,* 505 U.S. 557, 561–63, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992), the Supreme Court all but pronounced the death knell of the *Johnson* factors. By the time of *Dague,* it was widely regarded that the only significant *Johnson* factors which the Supreme Court had not expressly rendered moot by calculation of the lodestar were the contingent nature of the fee-shifting undertaking and the difficulty of prevailing on the merits. In *Dague,* the Supreme Court expressly rejected both of these as factors to be considered. Writing for a majority of six, Justice Scalia closed the substantive portion of his opinion by stating,

> And finally, the interest in ready administrability that has underlain our adoption of the lodestar approach, see, *e.g., Hensley, supra,* 461 U.S., at 433, 103 S.Ct., at 1939, and the related interest in avoiding burdensome satellite litigation (the fee application 'should not result in a second major litigation,' *id.,* at 437, 103 S.Ct., at 1941), counsel strongly against adoption of contingency enhancement. Contingency enhancement would make the setting of fees more complex and arbitrary, hence more unpredictable, and hence more litigable. It is neither necessary nor even possible for application of the fee-shifting statutes to mimic the intricacies of the fee-paying

the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Johnson v. Georgia Highway Express,* 488 F.2d at 717–19.

**6.** In enacting Section 1988, Congress also expressed its intent that "the amount of fees awarded under [Section 1988] be governed by the same

standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature" and that attorneys be compensated "for all time reasonably expended on a matter." S.Rep. 94–1011 at 6, 1976 U.S.C.C.A.N. at 5913.

market in every respect. *See Delaware Valley I,* 478 U.S., at 565, 106 S.Ct., at 3098.

*Id.* at 566–67, 112 S.Ct. at 2643.

To this Court, the clear implication of this language was that the lodestar computation would establish definitively the reasonable fee for a prevailing plaintiff's counsel in virtually every case. Because the Supreme Court in *Dague* purported to explain rather than distinguish *Hensley,* however, it appeared that it would continue to be appropriate to subtract from the lodestar computation hours devoted to issues on which the plaintiff did not prevail.[7]

Until the end of 1992, it seemed a fair reading of the cases culminating with *Dague* that the Supreme Court had decided to adopt a bright line rule which, once made in accordance with the Supreme Court's directives, would produce a "reasonable fee" as a matter of law. If this reading were correct, it would follow that adjustments to lodestar calculations based upon a reasonable hourly rate would be limited to striking excessive hours, either by virtue of inefficient use of time or of the fact that the hours were devoted to an issue on which plaintiff did not prevail.[8]

■■■ Determination of the lodestar, however, is not one that can be made by simple arithmetic calculation. Both elements of the lodestar calculation, reasonable hours and reasonable rates, require the district court to determine what is reasonable. The determination of the reasonable number of hours contemplates that the district court not only will exclude wasted or excessive hours,[9] but also hours devoted to issues on which the plaintiff did not prevail.[10] The determination of the reasonable hourly rate contemplates that the district court will ascertain the training, experience and overall competence of the lawyer and the "prevailing market rates in the relevant community" for lawyers of similar training and experience.[11]

■ In *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the Supreme Court revisited the issue of awarding fees to plaintiffs who achieve only limited or partial success. In *Farrar,* the Supreme Court held that a plaintiff who wins nominal damages may be considered a "prevailing party" for attorney's fees purposes, but that this status does not necessarily entitle a plaintiff to a fee. *Id.* at ——, 113 S.Ct. at 574–75 (holding as a matter of law that the reasonable attorney's fee in this case was zero). On the contrary, the Court stated, " 'Where recovery of private damages is the purpose of ... civil rights litigation, a district court, in fixing fees, is obligated to give

---

7. *See Hensley, supra,* 461 U.S. at 432, 103 S.Ct. at 1939.

8. Despite the Supreme Court pronouncements, the law on attorney's fees at the appellate level remains murky. In some cases, the Ninth Circuit continues to rely on the twelve *Johnson* factors in awarding attorney's fees, ignoring the line of cases culminating in *Dague. See, e.g., Larez v. Holcomb,* 16 F.3d 1513, 1522 (9th Cir. 1994) (remanding for recalculation of fees because " 'result obtained' at trial is one of the twelve factors that a district court is obliged to consider in determining an appropriate fee award"); *Dayton Haworth v. State of Nevada,* 56 F.3d 1048, 1051 (9th Cir.1995) (interpreting fee-shifting provision of Fair Labor Standards Act); *McGinnis v. Kentucky Fried Chicken of California,* 51 F.3d 805, 809 (9th Cir.1994) (construing Washington statute under federal attorney's fee law). In other cases, the Ninth Circuit continues to invoke the *Johnson* factors as a basis for adjusting the lodestar calculation downward, without analyzing whether they have been deemed subsumed under *Dague. See, e.g., Credit Managers Ass'n v. Kennesaw Life & Acc. Ins.,* 25 F.3d 743, 750 (9th Cir.1994); *Sloman v. Tadlock,* 21 F.3d 1462, 1475 (9th Cir.1994).

9. *See Hensley, supra,* 461 U.S. at 434, 103 S.Ct. at 1939–40 ("Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary....").

10. *Id.* at 440, 103 S.Ct. at 1943 ("Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee.").

11. *See Blum v. Stenson, supra,* 465 U.S. at 894–96, 895 n. 11, 104 S.Ct. at 1546–47, 1547 n. 11 ("[T]he burden is on the fee applicant to produce satisfactory evidence ... that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.").

primary consideration to the amount of damages awarded as compared to the amount sought.'" *Id.* at ——, 113 S.Ct. at 575, *quoting Riverside v. Rivera,* 477 U.S. 561, 585, 106 S.Ct. 2686, 2700, 91 L.Ed.2d 466 (1986) (Powell, J., concurring in judgment). The Court concluded, "In some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fee at all." *Id.*

This is not a result that can be reached by first doing a lodestar calculation and then adjusting the number of hours. Plaintiffs in *Farrar* proved a violation of their constitutional rights in a case in which liability was not admitted. The *Farrar* opinion, however, contains no suggestion that plaintiff's counsel should be compensated on a lodestar basis for the work done in proving the constitutional violation. The opinion also contains no suggestion that the Supreme Court's conclusion that no attorney's fee should be awarded in this case could be justified in any way if lodestar analysis were used as the starting point. The opinion simply states that in a case of limited or partial success, "[h]aving considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness ... or multiplying 'the number of hours reasonably expended ... by a reasonable hourly rate.'" *Id.* at ——, 113 S.Ct. at 575.

█ The Ninth Circuit recently interpreted *Farrar* by holding that it does not set forth a *per se* rule that an award of fees premised upon an award of nominal damages is always an abuse of discretion. *Wilcox v. City of Reno,* 42 F.3d 550, 554 (9th Cir.1994). Rather, a district court may choose to award fees after a judgment for only nominal damages if it points to some way in which the litigation succeeded, "such as sparking a change in policy or establishing a finding of fact with potential collateral estoppel effects." *Id.* at 555. The determination of a reasonable fee in such a case remains within the discretion of the district court. "The district court is in the best position to ascribe a reasonable value to the lawyering it has witnessed and the results that lawyering has achieved." *Id.*

## B. *Attorney's Fees in this case*

This case presents yet another permutation of the attorney's fee problem. Depending on how the facts of the case are characterized and how they are fit into the legal precedents, an attorney's fee could range widely. On the one hand, plaintiff could be considered to have achieved only "partial or limited success," and hence be entitled to little or no attorney's fees under a *Farrar*-type analysis. On the other hand, plaintiff could be considered the prevailing party whose lawsuit achieved other tangible results or substantial success who is entitled to reasonable attorney's fees for her successes. The Court awards fees under the second analysis.

### 1. *Low Fees or No Fees*

█ Under the first hypothesis, plaintiff could be considered to have prevailed only in a technical sense and be entitled to low or no attorney's fees. In *Farrar,* the Supreme Court stated that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar, supra,* —— U.S. at ——, 113 S.Ct. at 573. The Court found that "[a] judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." *Id.* at ——, 113 S.Ct. at 574. In this case, plaintiff can be considered a "prevailing party," because she obtained an enforceable judgment of $1 in compensatory damages and $9109 in punitive damages, amounts that defendants otherwise would not have been obligated to pay.

Nevertheless, if this were a case seeking only private damages, the Court could determine that a reasonable fee in this case was either no fee or very low fees because the degree of plaintiff's monetary success was minimal. *See id.* at ——, 113 S.Ct. at 575. In this case, plaintiff originally sued 52 individuals, claiming $20 million in compensatory and punitive damages from each defendant,

and the City of Los Angeles, claiming $10 million in compensatory damages. By March 1993, the Court had ruled that the liability of the officers already had been established in the *Gomez* case, and defendants had stipulated to the punitive damages award. Only eight of the original defendants remained in the case when the trial began, and the sole issue presented at trial was the amount of compensatory damages to which plaintiff was entitled. The case was mistried twice, both times due to the conduct of plaintiff's counsel. The third trial reached a verdict of $1 in compensatory damages.

■ While giving primary consideration to the amount of recovery sought may be appropriate for civil rights cases seeking only monetary compensation, the Court rejects such an approach in cases involving the vindication of constitutional rights that go beyond the particular parties in a case and that cannot be reduced to monetary terms. To hold otherwise would ignore the significant benefits derived from the filing of meritorious civil rights cases that do not result in high damage awards.

In the Court's experience, significant cases that result in nominal compensatory damages and low punitive damages tend to involve "unattractive" plaintiffs who suffered unconstitutional harm. In these cases, the level of recovery does not reflect necessarily the importance of the constitutional rights being vindicated. *See Gomez, supra,* 804 F.Supp. at 75–76 (discussing the necessity of a fee enhancement for such cases). Counsel for plaintiffs in such cases often recognize the jury's reluctance to grant compensatory damages and argue to juries that they should ignore the plaintiffs' unattractive circumstances while awarding punitive damages to deter future misconduct. Low compensatory damages often result. It is also the Court's experience that relatively "low" punitive damages are awarded in such cases because they often are tailored to the individual officers' incomes. Juries, not informed of in-

demnification provisions such as Cal.Gov. Code § 825(b), consider the sums to be significant for officers whom they believe pay the awards out of their own pockets.[12]

It is attorneys in these "undesirable" cases that will not be compensated reasonably if attorney's fees are tied to the level of monetary recovery. And it is these cases that often require the greatest need for vindication of plaintiffs' constitutional rights. Because plaintiff in this case sought vindication of the same rights at issue in the *Gomez* case, the Court finds that plaintiff's claim against the officers seeks more than just "private damages."

2. *Reasonable Attorney's Fees in this case*

a. *Plaintiff's Nonmonetary Successes*

Plaintiff has prevailed on her claims against the individual defendant officers and has been awarded nominal compensatory damages as well as punitive damages. She therefore is entitled to reasonable attorney's fees. Even if she were considered to have prevailed only on a technical basis, plaintiff also has achieved nonmonetary successes in this case, and therefore is entitled to reasonable fees on this basis as well.

In establishing that the City Council members were not entitled to absolute immunity for their decision to indemnify police officers pursuant to Cal.Gov.Code § 825(b), *see Trevino v. Gates,* 798 F.Supp. 621, 623–24 (C.D.Cal.1992), *aff'd,* 23 F.3d 1480 (9th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 327, 130 L.Ed.2d 286 (1994), plaintiff enabled the public and the Court to scrutinize more carefully the decisionmaking process of the City Council. Although the Court ultimately determined that the individual Council members were entitled to qualified immunity and that the facts of this case did not give rise to an unconstitutional policy of routinely paying punitive damages without regard to the statutory factors, plaintiff did bring to light a

---

12. Unlike the usual situation involving individual defendants, in which juries presume the existence of insurance, there is little reason to believe that they assume indemnification of officers' punitive damages in light of the way the damages are argued.

It is for this reason that the Court rejects the Ninth Circuit's analysis in *Corder v. Brown,* 25 F.3d 833, 836–37 (9th Cir.1994). Although the Court is unfamiliar with all of the facts of that case, the results appear to be consistent with the Court's observations.

disturbing trend that could raise constitutional questions in another case.[13]

The Court, moreover, is advised by plaintiff, and defendants have not contradicted her, that since the Supreme Court denied *certiorari* on October 11, 1994, the City Council has altered its procedures as to indemnification votes and has voted to refuse to indemnify LAPD officers for punitive damages. It appears that establishing the principle that members of a local government personally are not absolutely immune from liability for their discretionary voting actions has affected the actions of the City Council. If plaintiff had not overcome the hurdle of absolute immunity, the City Council would not have had to examine its past voting practices.[14]

Plaintiff also has pointed to nonmonetary successes that relate to the individual officer defendants, including the vindication of plaintiff's civil rights; the vindication of the community's rights in general; the initiation of a grand jury investigation that may result in indictments for the commission of perjury in the *Gomez* case; and the fact that no S.I.S. member has killed anyone since the filing of the action on April 1, 1992. Plaintiff's Reply at 3–4. The first two successes are not convincing, because most of the work already was done in the *Gomez* case when the liability of the defendants was established. The Court believes, however, that the latter two successes, uncontradicted by defendants, in conjunction with the stipulated punitive damages award, justify an award of attorney's fees in this case.

### b. *Calculation of Attorney's Fees*

■ In calculating the reasonable attorney's fee in this case, the Court shall begin with a lodestar calculation. In determining the reasonable hourly rate, the Court looks to the prevailing market rates in the relevant community for similar services. *See Stewart v. Gates*, 987 F.2d 1450, 1453 (9th Cir.1993). As in *Gomez* and *Gillen*, the Court will look to the rates charged by defense attorneys hired by the City of Los Angeles to defend

**13.** Until this case was brought, the City had not synthesized the information necessary to evaluate the possible effects of the City Council's indemnification of police officers. As a result of this lawsuit, discovery revealed that between January 1986 and October 1994, no case existed in which a police officer represented by the City Attorney against whom punitive damages were awarded ever had to pay those damages out of his own pocket. The City identified eighteen cases involving punitive damages that had settled after the judgment was entered and eleven cases in which the City Council voted to indemnify the officers for their punitive damages. For the cases that settled, the Court found little evidence that the City Council had considered the statutory factors set forth in Section 825(b) before authorizing the settlements, even though the City, which has no legal obligation to settle the punitive awards, effectively indemnified the officers when they did.

In this case, the Court did not reach the question whether these cases amount to a policy of deliberate indifference that contributes to a pattern of excessive force, because it did not appear that the City Council had sufficient information before it to have been put on notice of the issue. Plaintiff, by bringing this lawsuit, caused the City to examine the data for the first time. The information now has been developed, however, and a future lawsuit showing the same pattern had continued may cause a different result.

**14.** It might seem anomalous to consider a successful interlocutory issue against the City Coun-

cil member defendants (against whom plaintiff did not ultimately prevail) as a basis for awarding fees against the individual defendant officers. *See Farrar, supra*, —— U.S. at ——, 113 S.Ct. at 572 ("Liability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant.").

The Court nevertheless includes this interlocutory victory in the calculus of plaintiff's overall success because the ratification claim against the Council would have been hard to raise in any other lawsuit. Plaintiff was able to file this lawsuit after the City Council voted to indemnify the police officers involved in her father's death because she was unborn at the time of the original lawsuit. If the Council's actions amounted to deliberate indifference or a ratification of an unconstitutional policy, plaintiff was in the unique situation of being able to prove harm from a post-judgment act.

The real party in interest for both claims against the Council members and the officers was the City of Los Angeles, whose policies were the underlying subject of litigation. In this case, the City's attorneys represented both sets of defendants and their decisions with respect to each set affected the litigation of the other. In such a circumstance, and because the officer defendants are not paying the attorney's fees out of their own pockets, the Court believes it to be appropriate to consider this success for purposes of awarding attorney's fees.

excessive force cases as a relevant community for determining plaintiffs' rates.[15] Those rates are as follows: $175 per hour maximum; $125 to $135 per hour for attorneys for partner status and experience; and $90 to $125 per hour for associates.

Although the same lead counsel worked on all three cases, the Court rejects a proposition for which there is support in Supreme Court decisions—that a single hourly rate exists which is appropriate for a lawyer of given training and experience, regardless of the complexity of the matter he or she undertakes or the nature of the constitutional right vindicated. *See Blum v. Stenson, supra,* 465 U.S. at 893–96, 104 S.Ct. at 1546–47 (citing legislative history suggesting that § 1988 fees should "be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases ..."); *Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989) (same). *Cf. Finkelstein v. Bergna,* 804 F.Supp. 1235, 1242–45 (N.D.Cal. 1992) (holding that hourly rates for civil rights cases should be set in reference to cases of comparable complexity across the full spectrum of cases in federal court litigation).[16]

This case, like *Gillen,* involved very simple issues. The liability of the police officers already had been determined by the *Gomez* litigation. The plaintiff, a little girl, was not an unattractive plaintiff. The case that was tried three times before a jury involved the amount of compensatory damages to which plaintiff was entitled, the equivalent of a lawsuit over compensatory damages in a state wrongful death case. A few legal issues, such as questions of collateral estoppel and qualified and absolute immunity, were more complex. Considering all of these factors, the Court finds an hourly rate of $135

---

15. In *Gomez v. Gates,* 804 F.Supp. 69 (C.D.Cal. 1992), the Court discussed the difficulty of establishing a reasonable hourly rate for attorneys representing plaintiffs in excessive force cases. Noting that no commercial hourly rate exists for these lawyers who work mostly on a contingency basis, the Court concluded that the most realistic comparison would be the rate charged by lawyers who represent defendants in these cases. *See Gomez, supra,* 804 F.Supp. at 76–77. The Court, however, held that the defense hourly rate would not be sufficient to induce a qualified lawyer to take on the *Gomez* case, which involved commercially "unattractive" plaintiffs who were unlikely to be awarded a substantial recovery regardless of the constitutional importance of the issues raised. The Court held that plaintiff's proposed hourly rates of $350 for lead counsel and $235 for associate counsel were reasonable and necessary to induce a lawyer competent enough to have prevailed in this case. The Court awarded $430,460 on this theory. *Id.* at 78.

Alternatively, the Court held that the maximum defense rates of $175 for partner-level attorneys and $125 for associate-level attorneys were the appropriate ones, but that an enhancement was required in cases that are commercially "unattractive." *Id.* at 75–76. The Court added a multiplier of 1.75 to the lodestar calculation of $216,100, for a total fee of $378,175. Because the higher hourly rate was not being paid to plaintiffs' lawyers in this market, the Court awarded the lower fee. *Id.* at 78–79.

*Gomez* was followed by *Gillen v. Gates,* 847 F.Supp. 1475 (C.D.Cal.1994), *aff'd,* 56 F.3d 71 (9th Cir. June 1, 1995) (Table). In *Gillen,* a plaintiff complained of a non-intrusive search of her belongings at the Los Angeles airport. A jury awarded plaintiff $1 in compensatory and $3000 in punitive damages. Although *Gillen* involved the violation of a constitutional right, the Court concluded that it would not award the same hourly rates as it did in *Gomez.* The case involved no novel issues of law or important issues of policy; the function of counsel merely was to elicit relevant testimony from witnesses and to argue credibility. The Court determined that a reasonable hourly rate was $125, the equivalent of the associate-level defense rate. *Id.* at 1479–80. After reducing the number of hours for issues on which plaintiff did not prevail, the Court awarded fee of $16,562.50. The Ninth Circuit recently affirmed. *See* Memorandum, filed June 1, 1995.

16. The Court agrees with the district court's comments in *Finkelstein:*

Congress presumably wanted courts to be sensitive to market realities, and to fashion market definitions that would provide reasonable assurance that each potentially meritorious civil rights claim would receive a level/quality of legal service commensurate with (and not appreciably more sophisticated or elaborate than) the needs of that claim.... To ignore [the reality that not all civil rights cases reflect the same level of complexity or implicate interests of the same importance] would risk either underpaying lawyers who take on complex civil rights actions ... or overpaying lawyers who take on simple civil rights cases, creating an unjustifiable windfall.

*Finkelstein, supra,* 804 F.Supp. at 1244.

for plaintiff's lead counsel and $100 for associate counsel reasonable in this case.

■ As for the reasonable number of hours expended on the litigation, the Court shall award fees based only on the hours spent on litigation against the individual officer defendants, who were the only defendants against whom plaintiff prevailed. Plaintiff's lead attorney claimed a total of 587.2 hours and associate counsel claimed 112.5 hours. The Court eliminates 277 of these hours because they were spent on litigation against the City and the City Council members, defendants against whom plaintiff did not prevail.[17]

The Court reduces lead counsel's remaining 310.2 hours by 30% to take into account the Court's perception that this case could have been tried much more efficiently and because the vague entries in plaintiff's counsel's time sheets preclude any further meaningful review.[18] *See Hensley, supra,* 461 U.S. at 434, 103 S.Ct. at 1939–40. The Court finds that all the hours claimed by the associate counsel relate to the officer defendants. The Court, however, also reduces associate counsel's hours by 30% for the same reasons stated above. This results in 217.14 hours reasonably expended by plaintiff's lead counsel and 78.75 hours reasonably expended by plaintiff's associate counsel. Applying the $135 hourly rate to lead counsel's hours and the $100 hourly rate to associate counsel's hours results in a lodestar calculation of $37,188.90.

■ Taking into account the totality of the circumstances, however, the Court concludes that the lodestar calculation must be adjusted further downward. If the case had been brought only against the individual officers and achieved only the results obtained against them, the Court would have awarded not much more than nominal fees under a *Farrar*-type analysis. Instead, after having determined that plaintiff is entitled to reasonable attorney's fees in part because of her nonmonetary successes against the City Council members, the Court has arrived at a lodestar calculation based on the hours spent on litigation against the individual officer defendants. In the Court's judgment, the result of this lodestar calculation remains excessive, because the hours spent on litigation against the officer defendants do not bear much relation to the nonmonetary success achieved against the City Council members. Therefore, in the exercise of its discretion and considering the *Johnson* factor of "results obtained," the Court reduces the lodestar calculation fee to reach a reasonable fee award of $25,000.[19]

## III. CONCLUSION

The Supreme Court and the Ninth Circuit repeatedly have emphasized the discretionary nature of attorney's fee awards. *E.g., Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.ed.2d 40 (1983); *Wilcox v. City of Reno,* 42 F.3d 550, 555 (9th Cir.1994). Despite the hortatory statements, district courts still are forced to fit their judgmental decisions to the constantly changing dictates of fee-shifting rules of law. The oft-repeated statement that "[a] request for attorney's fees should not result in a second major litigation," *Hensley, supra,* 461 U.S. at

17. The Court calculated the number of hours worked on issues relating to the City Council members based on the information available in the time records and the information in the Court's own records. The Court excluded hours spent on litigating issues such as absolute and qualified immunity and related discovery disputes.

18. Plaintiff's counsel's time records are not detailed and many of the entries are generic, with statements such as "draft interrogatories" or "draft and redraft letter to opposing counsel."

19. In the alternative, the Court reaches a similar figure by determining that all the hours spent litigating the issue of absolute immunity were well spent and deserving of compensation, while the large majority of the remaining hours spent on litigation was a waste of time. The Court calculates that plaintiff's lead attorney worked a total of 56.75 hours on the litigation of absolute immunity. As for the hours spent on remaining issues, the Court determines that only 20% of those hours reasonably were spent to achieve the resulting verdict. Twenty percent of plaintiff's lead counsel's remaining 530.45 hours results in 106.09 hours; twenty percent of associate counsel's 112.5 hours results in 22.5 hours. A reasonable attorney's fee in this case using these numbers (multiplying lead counsel's $135 hourly rate by 162.84 hours and multiplying associate counsel's $100 hourly rate by 22.5 hours) results in a fee of $24,233.40.

437, 103 S.Ct. at 1941, will remain a nullity until the Supreme Court and appellate courts stop trying to impose legal restraints on the way judicial discretion concerning the reasonableness of attorney's fees is exercised and realize that these decisions inherently are incapable of predetermination.

The difficulties this court has faced in this case, *Gomez,* and *Gillen* illustrate the difficulties that trial courts face in producing reason and justice in individual cases when Congress or appellate courts try to impose prospective legal restraints on the way judgment is exercised in decisions involving numerous and complex fact permutations. In these decisional areas, no single rule or small number of general rules can be crafted to produce consistent justice in all of the cases to which the rule would be applicable.[20] The attempt to fashion rules in advance, the application of which will govern decisions as to events which occur later, inevitably fails. The trial court is put to the impossible task of trying to identify and articulate all of the factors that went into its decision and their relative weights. The final authority for determining whether the "correct" factors were identified and whether they were weighed properly, lies in the courts least familiar with the facts of a case. The appellate courts' attempts to provide further guidance to deal with the facts of each new case inevitably produces a plethora of confusing and conflicting precedents that trial courts are obliged to follow or distinguish.[21] When the rules governing "abuse of discretion" become so numerous, complex and difficult to follow as they have in this area, the very meaning of "discretion," along with its necessary virtues, are lost.

Having reviewed the papers filed in connection with this matter, having heard oral argument, and being fully apprised of the relevant facts and law,

IT IS HEREBY ORDERED that the motion for attorney's fees of plaintiff Johanna Trevino be GRANTED. Attorney's fees HEREBY ARE AWARDED in the amount of $25,000.00.

IT IS SO ORDERED.

---

20. It is precisely when precedents will not have sufficient reach on subsequent facts that the law traditionally grants courts and juries broad discretion. Legal standards that call for jury determinations of what a "reasonable person" might do, or what an "average consumer" might think, are examples. As a society we are comfortable with the fact that one jury might reach one result and another something different when applying the same legal standards to the same set of facts.

As the Court discussed in *U.S. v. Davis,* 715 F.Supp. 1473, 1475–77 (C.D.Cal.1989), *aff'd in part, vacated in part,* 960 F.2d 820 (9th Cir.), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992), the purpose of judicial discretion is to provide the same kind of flexible legal rule

where needed for judicial decisions. It is inevitable that trial courts will differ as to how those rules should be interpreted in particular cases. Unless an error of decision rises to the level of abuse, however, each decision binds only the parties and does not produce a precedent which thereafter must be followed or distinguished.

21. The amount of work required to do this as if it were a legitimate legal exercise is excessive and extremely burdensome. Although the Court does not keep time records, the total judicial time expended on fee issues in this case, *Gomez,* and *Gillen,* far exceeds the time devoted to the trial of these cases.